IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HAROLD STARR, | ) | Case No. 1:17-cv-2576 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.    Introduction

Plaintiff, Harold Starr, seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Supplemental Security Income Benefits under Title XVI of the Social Security Act ("Act").  This matter is before the court pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).

Because the ALJ failed to apply the correct legal standards, I recommend that the final decision of the Commissioner be VACATED and the matter be REMANDED for further proceedings.

## II.    Procedural History

Starr protectively applied for supplemental security income benefits on November 10, 2014.  (Tr. 108)  He initially alleged a disability onset date of December 30, 2007 (Tr. 109), but later amended his alleged onset date to November 10, 2014.  (Tr. 226)  His application was denied initially on February 10, 2015 (Tr. 108-118) and after reconsideration on June 23, 2015.

(Tr. 119-131)  Starr requested an administrative hearing (Tr. 151-152), and Administrative Law Judge ("ALJ") Pamela E. Loesel heard the case on October 4, 2016.  (Tr. 10, 38)  The ALJ found Starr not disabled in a January 12, 2017 decision.  (Tr. 10-21)  Starr requested review of the hearing decision on January 24, 2017.  (Tr. 200)  On November 17, 2017, the Appeals Council denied review, rendering the ALJ's conclusion the final decision of the Commissioner.  (Tr. 1-3)  On December 12, 2017, Starr filed this action challenging the Commissioner's final decision.  ECF Doc. 1.

## III.  Evidence

### A.  Personal, Educational and Vocational Evidence

Starr was born on September 6, 1967 and was 47 years old when his application was filed.  (Tr. 19)  Starr completed the 10th grade and worked in a factory.  (Tr. 654)  His work experience includes working as an ink press operator and as a packager.  (Tr. 19)

### B.  Medical Evidence[1]

An MRI of Starr's cervical spine performed on February 20, 2007 showed borderline congenital/developmental stenosis and superimposed degenerative changes with spurring resulting in mild and moderate cord compression at C4-5.  (Tr. 380)

On September 16, 2014, Starr went to the Beachwood Health Center for a gout flare up in his great toe.  He reported that he had been diagnosed with gout a month earlier.  (Tr. 375)  After reporting that he had fallen twice due to gout, he was prescribed a straight cane and a TENS unit.  (Tr. 396)

---

[1] The record contains evidence regarding Starr's mental impairments.  Because Starr's appeal does not relate to his mental impairments or the ALJ's consideration thereof, that evidence is not addressed in this report.

2

Starr saw Matthew Baltes, D.O., on October 27, 2014.  Starr reported a history of hypertension and gout; he also complained of right shoulder pain for the preceding few months. (Tr. 374)  Physical examinations showed tenderness over the insertion of the rotator cuff; his rotator cuff was intact; and his range of motion was limited.  (Tr. 375)

Dr. Baltes referred Starr to the Physical Medicine and Rehabilitation (PM&R) Clinic.  On November 7, 2014, Starr reported to PM&R that his shoulder pain started after a motor vehicle accident in 2006, but began to bother him more around September 2014.  Examination showed tenderness over his bicipital groove and lateral deltoid with decreased range of motion.  (Tr. 371) He had normal reflexes, sensation and fine and gross motor examinations in his extremities.  (Tr. 372, 440)  An x-ray of Starr's right shoulder was normal.  (Tr. 372)  Ann Harrington, CNS, diagnosed right shoulder tendonitis.  (Tr. 372-373)  She recommended a steroid injection and physical therapy.  (Tr. 372)

At Starr's first physical therapy appointment on November 19, 2014, he had limited range of motion, gross right upper extremity weakness, and severe antalgic guarding.  (Tr. 367)  On December 14, 2014, Starr reported that he had a flare up of gout and had fallen twice the day before.  Starr requested a cane.  (Tr. 511)  However, on December 16, 2014, Starr returned to physical therapy and was ambulating without a cane and his gait was not antalgic.  (Tr. 461) Therapy improved Starr's range of motion and strength, but he continued to report high levels of pain.  His strength in his right upper extremity was 4-/5; he continued to have decreased range of motion and antalgic guarding.  (Tr. 454)

On December 18, 2014, Starr had another gout flare.  He was encouraged to use his cane due to his increased toe and foot pain and recent falls.  (Tr. 459)

3

On December 29, 2014, Starr was admitted to the hospital with reports of chest pain and dizziness.  (Tr. 485)  Echocardiogram testing showed he was experiencing an acute episode of congestive heart failure with cardiomyopathy and an ejection fraction of 35%.  (Tr. 480)  On December 31, 2014, Dr. Yan Dong examined Starr and noted that his extremities were normal, with no deformities, edema or skin coloration.  Cardiac examination showed regular rate and rhythm without murmurs, rubs, or gallops.  Starr was alert and in no acute distress.  (Tr. 591)  A cardiac catheterization showed diffuse ectasia with slow flowing.  (Tr. 495)  Starr was discharged on December 31, 2014.  The impression was atypical chest pain, which was likely musculoskeletal.  He started Plavix, Metoprolol and Crestor.  (Tr. 496)

On January 21, 2015, Starr followed up with cardiologist, Catherine C. Fallick, M.D.  (Tr. 469-472)  She diagnosed heart failure with LV acute systolic dysfunction, NYHA Class II.  (Tr. 471)

On April 29, 2015, Starr reported continued right shoulder pain with some swelling and began physical therapy again.  (Tr. 734)  At the outset of physical therapy, he reported pain of 8/10.  His scapula was protracted; he had decreased lordosis and tenderness with palpation of the bicep and along the rotator cuff.  (Tr. 752)  Examination showed positive impingement testing, Speeds testing and Supraspinatus testing on the right.  (Tr. 754)  The examiner was unable to elicit any reflexes in Starr's upper extremities.  He had decreased sensation to light touch and had difficulty donning shirts and jackets.  (Tr. 753)

On May 1, 2015, Starr reported to Dr. Fallick that he felt limited and had shortness of breath.  There was no improvement with decreasing his dosages of Metoprolol and Losartan.  (Tr. 741-742)  Dr. Fallick doubted that Starr's problems were related to his cardiac condition because he had a completely normal physical exam.  She ordered a sleep study and echocardiogram.  (Tr.

4

744)  The sleep study performed on June 17, 2015 showed prolonged sleep latency and sleep efficiency reduced at 60.8%.  (Tr. 798)  He was diagnosed with obstructive sleep apnea and obesity.  (Tr. 799)

On August 5, 2015, Dr. Fallick noted that Starr's left ventricular ejection fraction rate had improved to 50%.  She diagnosed heart failure with left ventricular dysfunction with improved ejection fraction.  (Tr. 819)

In October, 2015, Starr reported occasional chest pain, fatigue, tiredness, palpitations and shortness of breath.   (Tr. 936)   Cardiologist Jayati Rakhit, M.D., noted that Starr was neurologically intact.  (Tr. 939)  On October 31, 2015, a stress test showed normal stress and rest myocardial perfusion with no evidence of ischemia.  However, it also showed abnormal regional wall motion of the left ventricle with an estimated ejection fraction of 40-45% with mild to moderate global hypokinesis.  (Tr. 898)  In November of 2015, he underwent another cardiac catheterization that showed moderate coronary artery disease, mild to moderate left ventricular dysfunction with a small apical aneurysm.  (Tr. 855)  From November 2015 through April 2016, Starr continued to report fatigue, tiredness, shortness of breath and palpitations to his cardiologist, Dr. Rakhit.  (Tr. 1052-1106)

In April 2016, x-rays of Starr's hips and pelvis showed bony prominence of the superolateral femoral head neck junctions bilaterally, consistent with cam-type femoral acetabular impingement.  (Tr. 851)  An x-ray of his lumbar spine showed mild degenerative changes.  (Tr. 852)

Starr went to the emergency room on August 10, 2016.  He reported chest pain and his blood panel showed some abnormalities.  (Tr. 1031-1032, 1046)  Starr was admitted overnight and diagnosed with unstable angina.  (Tr. 860)  On discharge, he was diagnosed with chest pain,

abnormal EKG, abnormal heart rhythm and slow heart rate.  (Tr. 1046)  When tested at cardiac rehabilitation on September 16, 2016, Starr had a very high resting heart rate.  (Tr. 1024)

### C.    Opinion Evidence

#### 1.    Treating Physician – Jayati Rakhit, M.D. – August 2016

On August 26, 2016, Dr. Rakhit, Starr's treating cardiologist, completed a medical source statement.  Dr. Rakhit opined that Starr could lift less than five pounds due to congestive heart failure, arthritis and loss of balance.  She limited Starr to a total of one hour of standing or walking during an eight hour work day.  She opined that Starr would be able to sit for less than two hours during a workday and without interruption for less than an hour.  Dr. Rakhit opined that Starr could rarely climb, balance, stoop, crouch, kneel, crawl, reach, push or pull.  He could rarely use fine or gross manipulation.  She also opined that environmental restrictions would affect Starr's impairment.  She noted that a cane, TENS unit, and breathing machine had been prescribed to Starr.  Dr. Rakhit opined that Starr's moderate pain would interfere with his concentration, take him off task and cause absenteeism.  She opined that Starr would need to elevate his legs 45 degrees, at will, throughout the day.  (Tr. 878)

#### 2.    State Agency Reviewing Physicians

Teresita Cruz, M.D., reviewed Starr's records on February 10, 2015.  Dr. Cruz opined that Starr had the functional capacity to perform sedentary work, with standing and walking up to six hours a day.  (Tr. 113-116)

Stephen Sutherland, M.D., reviewed Starr's records on June 23, 2015.  Dr. Sutherland opined that Starr could perform a range of light work with occasional overhead reaching.  (Tr. 126-129)  Starr points out that Dr. Sutherland was a neurologist (not a cardiologist) and did not

review any of the medical records showing ongoing substantial coronary impairment after January 2015.  ECF Doc. 11 at Page ID# 1196.

### D.    Relevant Testimonial Evidence

Starr testified at the hearing.  (Tr. 46-69)  Starr lived alone in a handicapped accessible home.  A friend helped him with activities such as dishes, cooking and laundry.  (Tr. 47)  He was able to use the microwave and prepare sandwiches for himself.  (Tr. 47)  Starr did not drive but was able to use public transportation.  (Tr. 48-nZ49)  Starr was participating in cardio therapy to strengthen his heart.  (Tr. 52)

Starr stated that his conditions with his heart, his hip, and his mood swings prevented him from working.  (Tr. 59)  His heart condition had worsened to the point that, if he attempted to lift anything over five pounds, he felt like his heart was tearing and causing sharp pain in his chest.  (Tr. 64)  However, he acknowledged that medication was helping and that his ejection fraction had improved.  (Tr. 59)

Starr also had problems with his hips and gout.  (Tr. 66-67)  But, Starr's heart condition was the main treatment concern because he could not get surgery on his hips until his heart condition stabilized.  (Tr. 60-61)  Starr's hip pain limited his ability to sit and/or stand to fifteen to twenty minutes at a time.  Starr could walk about ten minutes with his cane.  He used his cane every day for his gout and hip.  His gout attacks were unpredictable in terms of when they occurred and how long they lasted.  (Tr. 67)

Starr also had pain in his right shoulder.  This pain worsened with rain, sleet, or snow. This pain would wake Starr at night and prevented him from reaching overhead.  (Tr. 68)

Brett Salkin, a vocational expert ("VE"), also testified at the hearing.  (Tr. 69-74)  The VE answered a series of hypothetical questions which plaintiff has not challenged on appeal.  He

identified a significant number of jobs a person with Starr's RFC could perform.  The VE also

testified that a worker who was off task more than 20% of the workday, or who were tardy, left,

or was absent two or more times per month, would not be able to maintain employment.  (Tr. 74-

75)

## IV.    The ALJ's Decision

The ALJ's January 12, 2017 decision contained the following relevant findings:

2.      The claimant has the following severe impairments: congestive heart
failure, coronary artery disease, hypertension, obesity, arthritis (right
shoulder tendonitis and hips), spine disorder, affective disorder
(unspecified mood disorder unspecified depression, not otherwise
specified, unspecified mood disorder), anxiety disorder not otherwise
specified, and personality disorder not otherwise specified.  (Tr. 12)

4.      After careful consideration of the entire record, the undersigned finds that
the claimant has the residual functional capacity to perform sedentary
work as defined in 20 CFR 416.967(a) except he: is able to occasionally
lift and carry 10 pounds and frequently lift and carry 5 pounds; is able to
stand and walk 2 hours of an 8-hour workday; is able to sit for 6 hours of
an 8-hour workday; unlimited push and pull other than shown for lift
and/or carry; frequently climb ramps and stairs; never climb ladders, ropes
and scaffolds; even moderate exposure to hazards, meaning no
unprotected heights; and avoid concentrated exposure to extreme cold and
extreme heat.  The claimant can perform simple routine tasks consistent
with unskilled work.  He can perform work with low stress meaning no
arbitration, negotiation, responsibility of the safety of others, nor
supervisory responsibility.  He can perform work with superficial
interaction – meaning of a short duration for a specific purpose with
supervisors, coworkers and the general public.  (Tr. 15)

9.      Considering the claimant's age, education, work experience, and residual
functional capacity, there are jobs that exist in significant numbers in the
national economy that the claimant can perform.  (Tr. 19)

Based on her total findings, ALJ Loesel determined that Starr had not been under a disability

since November 10, 2014, the date his application was filed.  (Tr. 20)

## V.    Law & Analysis

### A.    Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3).  The findings of the Commissioner may not be reversed just because the record contains substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535,545 (6th Cir. 1986); see also *Her v. Comm'r of Soc. Sec*., 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

The court also must determine whether the ALJ decided the case using the correct legal standards.  If not, reversal is required unless the legal error was harmless.  *See e.g. White v.*

*Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

In considering an application for supplemental security income or for disability benefits, the Social Security Administration must use the following sequential analysis: at Step One, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step Two, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step Three, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step Four, the Commissioner determines whether or not the claimant can still perform his past relevant work; and finally, at Step Five, if it is established that claimant can no longer perform his past relevant work, the

burden of proof shifts to the Commissioner to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. See *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.  A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits.  20 C.F.R. §404.1512(a).

### B.      Treating Physician Rule[2]

Starr argues that the ALJ did not properly evaluate and weigh the opinion of Dr. Rakhit, his treating physician.  The ALJ's decision states that she gave "greater weight" to Dr. Rakhit's opinion.  However, Starr contends that the ALJ did not incorporate Dr. Rakhit's findings in the RFC and did not state good reasons for failing to do so.  Starr also argues that the ALJ erred in assigning greater weight to Dr. Cruz, the state agency reviewing physician, than he did to Starr's treating physician.

The administrative regulations implementing the Social Security Act impose standards for weighing medical source evidence.  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  In making disability determinations, an ALJ must evaluate the opinions of medical sources in accordance with the nature of the work performed by the source.  *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013).  The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

---

[2] 20 CFR §§ 416.927 applies to Starr's claim because it was filed before March 27, 2017.

Even if the ALJ does not give the opinion controlling weight, the opinion is still entitled to significant deference or weight that takes into account the length of the treatment and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist.  20 C.F.R. § 416.927(c)(2)-(6).  The ALJ is not required to explain how she considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion.  20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938.  ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned.")

The ALJ's "good reasons" must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).  As the Sixth Circuit has noted,

> [t]he conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors.  Otherwise the treating physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion.  Such a rule would turn on its head the regulation's presumption of giving greater weight to the treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Id.* at 377.

A failure to follow these procedural requirements "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based on the record."  *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007).  The Sixth Circuit Court of Appeals "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given

12

to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned."  *Cole*, 661 F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted).

The ALJ purportedly assigned "greater" weight to the opinions of Dr. Rakhit and Dr. Cruz, than she did to the opinion of state reviewing physician Sutherland, stating:

> As for the opinion evidence, the claimant's treating physician, Dr. Rakhhit [*sic*] opined that the claimant is limited to a range of sedentary work with postural and environmental limitations.  He also noted that the claimant has concentration difficulties due to his physical impairments (Exhibit B15F).  Similarly, State Agency medical consultant, Dr. Teresita Cruz, opined that the claimant could perform a range of sedentary with manipulative, postural, and environmental limitations (Exhibit B4A).  On reconsideration, Dr. Stephen Sutherland opined that the claimant could perform a range of sedentary [work] with postural and environmental limitations (Exhibit B5A).  Greater weight is given to the opinions of Drs. Rakhhit [*sic*] and Cruz, as the record shows that due to the claimant's cardiac conditions, combined with his obesity, degenerative disc disease, and arthritis, indicate that the claimant is more appropriately limited to a range of sedentary work.  Particularly, this is consistent with the claimant's reports of high levels of chest and shoulder pain.

(Tr. 18)

The ALJ did not assign controlling weight to the opinion of Dr. Rakhit.  For example, Dr. Rakhit opined that Starr was limited to lifting 5 pounds and walking and standing one hour.  (Tr. 877)  ALJ Loesel determined that Starr was able to frequently lift and carry 10 pounds and to stand and walk for two hours.  (Tr. 15)  Much of the ALJ's RFC determination differs from the opinion expressed by Dr. Rakhit.  I agree with the Commissioner's argument that the ALJ was not required to mimic every restriction in Dr. Rakhit's opinion.  But if the ALJ did not assign controlling weight to Dr. Rakhit's opinion, she was required to explain why.

The ALJ was required to point to "evidence in the case record, * * * sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating

13

source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The ALJ's decision is completely devoid of any such explanation. The decision does not even acknowledge the plain fact that the RFC findings differed from Dr. Rakhit's opinions.

The Commissioner's brief cites portions of the record that arguably would have supported the ALJ's findings. ECF Doc. 12 at Page ID# 1228. However, this *post hoc* rationale cannot supply reasons never actually offered by the ALJ. *See Johnson v. Sec'y of Health &Human Services,* 794 F.2d 1106, 1113 (6th Cir. 1986); *Gardner v. Colvin,* 2015 U.S. Dist. LEXIS 91197, *16 (N.D. Ohio 2015). Here, the ALJ provided no explanation at all.

The purpose of the "good reasons" requirement is two-fold. First, a sufficiently clear explanation, "lets the claimants understand the disposition of their cases," particularly when a claimant knows that his physician has deemed him disabled and therefore "might be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied." *Rogers,* 486 F.3d at 242 (quoting *Wilson* 378 F.3d at 544). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. In this case, the ALJ failed to provide any explanation for assigning less than controlling weight to Dr. Rakhit's opinion.

In some circumstances, an ALJ's failure to articulate "good reasons" for rejecting a treating physician opinion can be harmless error. These circumstances arise when (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with

the opinion," or (3) "the Commissioner has met the goal of § 1527(d) – the provision of the procedural safeguard of reasons – even though she has not complied with the terms of the regulation. "*Wilson,* 378 F.3d at 547. *See also Cole,* 661 F.3d at 940. In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments. *See Nelson v. Comm'r of Soc. Sec.,* 195 Fed. App'x 462, 470-471 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.,* 148 Fed. App'x 456, 464 (6th Cir. 2005); *Friend v. Comm'r of Soc. Sec.*, 375 Fed. App'x 543, 551 (6th Cir. 2010). "If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused." *Friend,* 375 Fed. App'x at 551.

Here, the ALJ simply did not provide *any* explanation for assigning less than controlling weight to Dr. Rakhit's opinion. The court cannot determine whether the ALJ even considered the elements contemplated by 20 C.F.R. § 416.927(c)(2)-(6), including whether the medical evidence in the record as a whole supported Dr. Rakhit's opinion. The ALJ's failure to provide "good reasons" for rejecting Dr. Rakhit's opinion regarding Starr's limitations was not harmless error. Even if good reasons existed to reject the treating physician's opinion, the ALJ failed to articulate those reasons, let alone with sufficient specificity to allow for meaningful review. The Court should reject the ALJ's determination.

Starr also argues that the ALJ erred in assigning more weight to the opinion of the state agency reviewing physician Dr. Cruz – who did not review a complete record – than to Dr. Rakhit's opinion. The ALJ stated that she assigned "greater" weight to Dr. Cruz's opinion than

the opinion of a subsequent reviewing physician.  It is not entirely clear that the ALJ assigned more weight to Dr. Cruz's opinion than to the opinion of Dr. Rakhit.  However, some of the functional limitations in the RFC seem to mimic those opined by Dr. Cruz.  (Tr. 15, 113-116)

In *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 409 (6th Cir. 2009), the Sixth Circuit held that in some circumstances opinions from state agency medical consultants may be entitled to greater weight than the opinions of treating sources, such as when the consultant's opinion is based on a review of a complete case record providing more detailed and comprehensive information than was available to the treating source.  Here, the opposite is true; it was Dr. Cruz who did not review a complete set of records.  Dr. Cruz reviewed Starr's records in February 2015, a year and a half before his hearing.  After Dr. Cruz reviewed the record, Starr received more treatment for his shoulder (Tr. 736) and his heart condition.  He was even hospitalized for his heart condition.  (Tr. 860)  Conversely, Dr. Rakhit's opinion was prepared in August 2016.  The ALJ did not explain why she adopted some of Dr. Cruz's limitations in her RFC assessment rather than the opinion from Starr's treating physician.

The ALJ failed to provide good reasons for assigning less than controlling weight to Dr. Rakhit.  The ALJ's adoption of many of Dr. Cruz's opinions, particularly when she did not review a complete record, is also questionable.  I recommend that this case be remanded and that the ALJ be directed to provide good reasons for assigning less than controlling weight to Starr's treating physician and to consider whether the state agency physician reviewed a complete record before assigning weight to her opinions.

## C.    Residual Functional Capacity

Starr argues that the ALJ's RFC finding was not supported by substantial evidence because she did not assign controlling weight to the opinion of Dr. Rakhit.  Starr contends that,

16

had the ALJ properly evaluated Dr. Rakhit's opinions, the RFC would have been different, particularly because Dr. Rakhit opined that Starr's pain would take him off task and cause absenteeism.  (Tr. 878)  Given the VE's testimony that being off task 20% of the time would render a person like Starr unemployable (Tr. 74), Starr argues that properly weighing of Dr. Rakhit's opinion would have changed the RFC finding.

The undersigned has already recommended that the Court remand this case because the ALJ did not provide good reasons for assigning less than controlling weight to Starr's treating physician.  If, upon remand, the ALJ assigns controlling weight to the opinion of Dr. Rakhit, the RFC will be more limited.  Accordingly, I recommend that the Court direct the ALJ to reconsider Starr's RFC after properly considering the opinion from his treating physician.

### D.      Failing to Recognize Gout as a Severe Condition

Starr contends that the ALJ erred in finding that his gout condition was not a severe impairment at Step Two.  At Step Two, a claimant must show that he or she suffers from a severe medically determinable physical or mental impairment.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  An impairment is considered non-severe when it "does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1521(a), 416.921(a).  The Regulations define basic work activities as being the "abilities and aptitudes necessary to do most jobs," which include:

1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
2) Capacities for seeing, hearing and speaking;
3) Understanding, carrying out, and remembering simple instructions;
4) Use of judgment;
5) Responding appropriately to supervision, co-workers and usual work situations; and
6) Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b) and 416.921(b).

The regulations provide that if the claimant's degree of limitation is none or mild, the Commissioner will generally conclude the impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities."  20 C.F.R. §§ 404.1520a(d), 416.920a(d).  The purpose of the second step of the sequential analysis is to enable the Commissioner to screen out "totally groundless claims."  *Farris v. Sec'y of HHS*, 773 F.2d 85, 89 (6th Cir.1985).  The Sixth Circuit has construed the Step Two severity regulation as a "de minimis hurdle" in the disability determination process.  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988).  Under a Social Security policy ruling, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ is required to treat it as "severe."  SSR 96-3p, 1996 SSR LEXIS 10 (July 2, 1996).

Here, the ALJ never mentioned Starr's gout condition.  She neither recognized it as a severe impairment nor explained her reasoning for determining it to be non-severe.  Records show that gout flare ups caused Starr to walk with an antalgic gait and to fall.  His request for a cane was due, in part, to his gout flares.  (Tr. 375, 511)  At his hearing, Starr testified that his gout flares made it difficult for him to walk and required the use of a cane.  (Tr. 66-67)  Given these records and Starr's testimony, the ALJ erred in determining that he failed to meet the *de minimis* burden of proving that his gout condition was severe.  Medical records showed that this impairment was having more than a minimal impact on his ability to work and that it had not fully resolved.

Even though the ALJ erred in failing to address Starr's gout, the court must analyze whether the error was harmless.  Once an ALJ determines that one or more of the claimant's impairments are severe, she must consider all the claimant's severe and non-severe impairments in the remaining steps of the sequential analysis.  The finding that Starr's gout was a non-severe

18

impairment at Step Two would be legally irrelevant if the ALJ considered it in the remaining steps of the sequential analysis. *See Anthony v. Astrue,* 266 Fed. App'x 451, 457 (6th Cir. Ohio 2008), citing *Mariarz v. Sec'y of Health & Human Servs.,* 837 F.2d 240, 244 (6th Cir. 1987) (holding that the failure to find that an impairment was severe was harmless error where other impairments were deemed severe). In cases such as this, courts look to see whether the ALJ actually considered impairments deemed non-severe at later steps in the sequential analysis. *See Simpson v. Comm'r of Soc. Sec.,* 344 Fed. App'x 181, 191, 2009 U.S. App. LEXIS 19206 (6th Cir. 2009); *White v. Comm'r of Soc. Sec*., 312 F. App'x 779, 787 (6th Cir. 2009)

Here, the ALJ determined that Starr suffered from several severe impairments. (Tr. 12) Because she determined that Starr suffered from these severe impairments, she was required to consider all of Starr's impairments, including those that were non-severe, in the remaining steps of her analysis, including in making her RFC finding. *See Simpson v. Comm'r of Soc. Sec.,* 344 Fed. App'x. at 191. The ALJ did not discuss Starr's gout at all. Thus, there is no indication that the ALJ considered his gout at any step of her analysis.

The Commissioner argues that there was evidence in the record showing that Starr's gout was non-severe because it did not meet the 12 month durational requirements of the Act. ECF Doc. 12 at Page ID# 1215. The Commissioner then cites the ALJ's decision noting that Starr generally had a normal gait, strength, and sensation and coordination in all extremities. (Tr. 16); ECF Doc. 12 at Page ID# 1216. Alternatively, the Commissioner argues that the ALJ's non-severe finding was harmless error. Defendant's brief invokes the appropriate law but then asserts, "[i]n fact, Dr. Cruz and Dr. Sutherland, the state agency medical consultants, considered Plaintiff's gout but did not find that it required he use a cane but that he should avoid even moderate exposure to hazards, such as machinery and heights." ECF Doc. 12 at Page ID# 1217.

19

The fact that the state agency physicians considered Starr's gout does not necessarily mean that the ALJ considered this impairment.  The Commissioner's argument does not confront the issue raised by Starr.  Starr's burden at Step Two was a *de minimis* hurdle and there was evidence in the record showing that his gout was severe.  But even if it was properly found to be a non-severe impairment, the ALJ was still required to consider it at the remaining steps of the analysis. It does not appear that she considered it at all.

The ALJ erred in failing to consider Starr's gout.  The court cannot find this error harmless because nothing in the ALJ decision indicates that this impairment was considered in formulating Starr's RFC.  The ALJ failed to follow the proper legal standards and I recommend remand on this basis.

### E.     Evaluation of Starr's Use of a Cane

Finally, Starr argues that the ALJ failed to properly analyze whether his cane prescription was medically necessary.  ECF Doc.11 at Page ID# 1205.  The Commissioner responds that the state agency physicians did not find that Starr required a cane.  ECF Doc. 12 at Page ID# 1217. The ALJ recognized that Starr's condition had deteriorated and that he was using a cane.  (Tr. 16-17)  However, she did not evaluate whether it was medically necessary and she did not include a limitation in the RFC related to his use of a cane.

Social Security Regulation (SSR) 96–9p, 1996 WL 374185 at *7 (July 2, 1996), provides that a claimant's occupational base "may be significantly eroded" by the need to use a cane or other hand-held assistive device.  However, SSR 96-9p specifically requires:

> [M]edical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (*i.e.*, whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)."  *Id.*  "For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or

20

ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded."

*Id.* at *7.

If a cane is not medically necessary, it cannot be considered a restriction or limitation on the claimant's ability to work, *Carreon v. Massanari,* 51 Fed. App'x 571, 575 (6th Cir. 2002), and the ALJ is not required to reduce the claimant's RFC accordingly.  *See Casey v. Sec'y of Health Servs.,* 987 F.2d 1230, 1235 (6th Cir. 1993).  A cane would be medically necessary if the record reflects more than just the claimant's subjective desire to use the cane.  *See Penn v. Astrue*, 2010 WL 547491, at *6 (S.D. Ohio Feb.12, 2010).  If the ALJ does not find that such device was medically necessary, then the ALJ is not required to pose a hypothetical to the vocational expert.  *See Casey v. Sec'y of Health Servs.*, 987 F.2d 1230, 1235 (6th Cir.1993).  However, "[when] there is conflicting evidence concerning the need for a cane, it is the ALJ's task, and not the Court's, to resolve conflicts in the evidence."  *Forester v. Comm'r of Soc. Sec.*, No. 16-CV-1156, 2017 WL 4769006 (S.D. Ohio Oct. 23, 2017) (internal quotation marks omitted).

Here, there was evidence that Starr needed a cane to walk.  His use of a cane was documented in the medical records and encouraged when he was having trouble walking.  (Tr. 459)  Starr testified that he used the cane every day.  (Tr. 67)  His treating physician stated that a cane had been prescribed in her medical source statement.  (Tr. 878)  Accordingly, there was evidence in the record that Starr needed a cane.  The ALJ erred by failing to evaluate whether the cane was medically necessary.  Had she done so, her RFC determination could have been more limited.  If the Court remands this case, as I have recommended, I also recommend that the ALJ be directed to evaluate the medical necessity of Starr's cane.

## VI.    Recommendation

Because the ALJ failed to apply the correct legal standards, I recommend that the final

decision of the Commissioner be VACATED and that this case be remanded for further

proceedings consistent with this recommendation.

Dated: August 22, 2018

Thomas M. Parker

United States Magistrate Judge

---

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts
within fourteen (14) days after being served with a copy of this document.  Failure to file
objections within the specified time may waive the right to appeal the District Court's order.  See
*U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985),
reh'g denied, 474 U.S. 1111 (1986).